(No. 19615.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JACK GOLD, Plaintiff in Error.

*Opinion filed October 19, 1929.*

W. W. O'BRIEN, (CLYDE C. FISHER, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and JAMES B. SEARCY, (EDWARD E. WILSON, and JOHN HOLMAN, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error, Jack Gold, was convicted in the criminal court of Cook county of the murder of Fred Matson, was sentenced to fourteen years' imprisonment in the penitentiary, and has sued out a writ of error.

The homicide occurred during an attempted robbery at the office of the Everett Coal and Coke Company, in Chicago, at No. 7694 South Chicago avenue, on February 5, 1927. This was the company's pay-day, and the pay-roll was being prepared that morning, about eleven o'clock, when three men armed with revolvers entered the office. Two of the men entered the front office by the front door opening on the street. They were subsequently identified as Louis Katzowitz and Patrick, whose Christian name does not appear. It was in this room that the homicide occurred. At the same time as they entered the main office from the

east by the front door the third man entered the back office by the side door opening on the driveway on the east. He was identified after his arrest, a year or more later, as the plaintiff in error. He opened the door with his left hand, holding his revolver in his right. Ambrose Burke and W. I. McClure, employees of the Everett Company, and Mark Stokes, a police officer detailed to protect the payroll, were in this room. As the plaintiff in error came in at the door he said, "Stick them up!" The two employees put up their hands but the police officer reached for his revolver in his overcoat pocket. The plaintiff in error snapped his revolver twice at the police officer, but it failed to explode. He went out, closing the door, and the officer started through the door to the front office, knowing there was a high wall which would prevent the escape of his assailant except at the end of the driveway where it opened into the street, and intending to head him off there.

Witnesses who were present testified as to the positions of objects and individuals by pointing them out on a plat to the jury. This method of testifying may have made the situation clear to those who saw the plat and heard the testimony but is less satisfactory to a court of review, where, as here, the plat is not in the abstract, which contains such statements as, "This line is the telephone switchboard here" [indicating]. "Here is an adding machine." "This is a counter desk and is covered." "This rectangular part in the rear, marked 'desk,' is five or six feet in length; that has a wire mesh; this line [indicating] is also a wire partition, with a wire door here, [indicating,] open wire, one inch mesh, six feet high." "This is the outside door of the driveway and goes right out to the sidewalk," etc. This, of course, throws no light at all on the situation and might as well have been omitted, together with the plat, if the plat was to be omitted. However, we have been able to piece together the scraps of information contained in the

abstract of the testimony so as to arrive at what we regard as a sufficiently definite perspective of the place to enable us to dispose understandingly of the case.

South Chicago avenue ran northwest and southeast. The office fronted north on the street, the front door being at the west end of the front wall. This door opened into a narrow space which extended the full width of the room and was separated from the working space of the office by two desks set end to end, beginning at the west wall and extending nearly across the room parallel with the street wall. Between the east end of these desks and the east wall, but a little further back from the front than the two desks, was the telephone desk against the east wall, and the passageway to the working space of the office was between the telephone desk and the other two desks. Most of the front wall was occupied by a large plate-glass window with a radiator in front of it. Back of the west desk of the two was an adding machine, and there were chairs and other desks in the office also. Back of the main office were two partitions, the space between which was used for a closet and hall. Across the hall a passage led to the rear of the building, in which was a smaller office known as the scales room, in which were tables, desks, an adding machine, and at the extreme end the scales. From it, also, doors opened to the outside in the east and west walls, the one in the west wall being just west of the scales in the northwest corner of the building and the one in the east wall at the southeast corner of the room. The latter led from the outside into a narrow space which was separated from the room by a desk and wire caging, with a wire door which afforded access between the scales room and the main office, to which the wire door was thus the rear entrance. The outside door at this entrance opened onto the driveway at the side of the building, and exit from the driveway was barred by a high wall, except where it joined the street at the front of the building.

During and just previous to the episode in the scales room just related, Peter M. Silar, the vice-president and manager of the Everett Company, was standing back of the desks which have been mentioned, talking across them to Fred Matson, who was in front and was applying for employment by the Everett Company, for which he had formerly worked, when Patrick and Katzowitz, the two confederates of the plaintiff in error, came quickly in through the front door, each one holding a revolver, and said, "Stick them up!" Silar put up his hands and turned around to the others in the office, of whom there were several, and said, "Everyone put up your hands." One of the robbers walked past Matson in front of the desks near the corner and the other took a position behind Matson. The man who went in front of Matson was Katzowitz, as Silar remembered later, and the other, who took the position behind Matson, was Patrick. Silar testified that he said to the boys, "Put them up," and turned back to the robbers and said: "For God's sake, fellows! Don't shoot anybody in your excitement!" that Patrick poked Matson in the back with the front of his gun and told him to hurry up, and the next thing Silar heard was a shot Patrick had fired. As soon as he heard the shot Silar backed down inside the counter, and when he next saw Matson he was lying dead at Silar's feet, inside the coal office. Silar looked up and saw officer Stokes entering the office from the scales room. Katzowitz was then standing in the passageway between the switch-board and the desks, and Silar said to Stokes, "Give it to him, Stokes! He came in here to get us!" but Stokes did not shoot Katzowitz. He had him covered and Katzowitz said, "For God's sake, don't shoot! You got me; what more do you want?" Katzowitz dropped his pistol at his feet and Silar picked it up and handed it to Stokes, and then the police came in and Katzowitz was arrested. Stokes testified that as he came into the rear of the main office a shot was fired from the front. He heard

the bullet whiz by him. He saw the office help standing with their hands held above their heads, Katzowitz with the revolver and someone in front of the counter. He fired two shots above their heads to avoid injuring the employees, thinking Katzowitz was the one who had fired the shot. He then covered Katzowitz and forced him to drop his revolver, which had not been discharged. Patrick had left by the front door, carrying his revolver, which was smoking, as Bernard McGivern, who was on the street, testified. About fifteen seconds later, McGivern further testified, he saw the plaintiff in error come out of the driveway with a revolver, which he shoved in his overcoat pocket, looking both ways. He ran southeast on South Chicago avenue to the next corner, which he turned with the machine he was riding in and turned north under the viaduct.

Counsel for the plaintiff in error state that their major assignment of error is that the State has not proved the crime of murder to have been committed,—that is, there has been a failure to prove the *corpus delicti*. They maintain that the shot which caused the death of Matson was from the revolver of the policeman, and assume that if this is the fact the homicide was not murder but was excusable because accidental. Without accepting this conclusion and without a discussion of the question, we are of the opinion that the evidence does not sustain the proposition of fact on which the conclusion is based. Stokes fired two shots from his revolver of .38-caliber, and he testified that he shot above the heads of the persons in the room. The room had been recently calcimined. After the shooting there was a bullet hole in the ceiling above the radiator and a .38-caliber bullet was found lying on the floor at the southeast corner of the east desk in the front office. The bullet hole on the front wall over the window, and the mark on the ceiling, indicated that the bullet had been deflected to the ceiling and had fallen to the floor, where it was found. There was another bullet mark in the ceiling over the desk

opposite the front door in the main office. Officers Mahoney and Nealon went up to the flat above the office and with a saw cut a hole in the floor and found a .38-caliber bullet in the underside of the flooring. Officer Mahoney examined the premises directly after the shooting and found a .32-caliber bullet that had been fired, on the floor of the front office, to the left of the door going to the back room. It had scaled the paper off the wall slightly. Mahoney placed a cross-mark on the bullet, by which he identified it at the trial. He testified that when he picked up the bullet there was a blood-stain on it and a fine cloth thread, but that there was a change from the time he picked it up on the day of the shooting, February 5, 1927. After holding it to the light he did not see the woolen fabric thread or the blood-stain then, at the trial, which were there on February 5, 1927. This was the only change in the condition. The cross-mark which he made with a knife on the bullet on February 5, 1927, was still there, but the bullet was different, because it had been handled in the two years, almost, which had elapsed since the shooting. Immediately above the front desks was a mark made in the ceiling, and there was another mark on the back wall, near where the .32-caliber bullet was found on the floor. The evidence shows that the bullet which caused Matson's death entered his body in the back, at the upper portion of the left shoulder-blade, passed upward through his neck, cutting the sub-clavicle artery, from which a fatal hemorrhage occurred. The mark in the ceiling indicated that the bullet was deflected toward the wall near which it was found, and was deflected by that wall to the floor.

The uncontested facts in this case are that Katzowitz, Patrick and a confederate attempted a hold-up of the office, in the course of which Matson was killed. Three shots were fired in the front office—two by the policeman, Stokes, and one by some other person. Four revolvers are mentioned in the evidence: one carried by the confederate who

ran away from the back room, taking it with him after two ineffectual attempts to fire it; one of .32-caliber carried by Katzowitz, which was dropped to the floor by him and found to have two empty chambers but no empty shells and had not been fired; one carried by Stokes, which was a .38-caliber and from which two bullets were fired, one of which was found in the floor of the flat above the front office, where it lodged after passing through the ceiling, and the other was found on the floor of the office at a place which made it impossible that it could have caused the fatal wound to Matson; the other revolver was carried by Patrick and was held by him against Matson's back at the instant when Matson was shot. In the excitement and confusion no one was able to testify that he saw Patrick shoot Matson. But Matson was shot. There was no other source from which the bullet could have come except Patrick's revolver. Without any of the evidence in regard to these bullets, it is clear beyond all reasonable doubt that Patrick killed Matson and was guilty of murder. The confederate in the back room was a joint conspirator with the two men in the front room to commit a robbery, and, of course, was equally responsible with them for their acts in endeavoring to accomplish the object of the conspiracy. His identity is established by the testimony of the three men who saw him in the scales room in his ineffectual attempt to assist in the enterprise, and of McGivern, who saw him running away with the revolver in his hand. Against this is only the vague testimony of his brother that Jack was helping him in his store at the time, which he is unable to fix by any definite circumstance.

Supposed errors argued by counsel for the plaintiff in error in regard to alleged prejudicial questions asked to which their objections were sustained, to incompetent evidence received, and to instructions given and rejected, are not of sufficient merit to justify extended discussion. The objection to the .32-caliber bullet found near the door lead-

ing from the front to the back office because it was not properly identified and was not in the same condition as on the day of the shooting was properly overruled. There was testimony tending to identify it by the mark placed on it by the policeman's knife and to explain its altered condition by reason of its handling, and it was properly received in evidence for the consideration of the jury in connection with all the other evidence in the case. The instructions in regard to murder and accessories were properly given. The qualification which it is suggested should have been inserted, "if the jury finds the offense has been committed," was contained in the defendant's instruction that before he could be found guilty of murder the People must prove, beyond a reasonable doubt, that "Matson came to his death from a shot that was fired out of a weapon which was held in the hand of the defendant, Jack Gold, or held in the hand of some person that the defendant, Jack Gold, aided, abetted or assisted in the committing of the crime of murder, as charged in the indictment." The court gave an instruction on reasonable doubt asked by the People and refused another asked by the plaintiff in error, and it is argued that both rulings were erroneous, and that there was error both in giving and refusing certain instructions on circumstantial evidence. Whether or not any or all of these instructions are subject to the criticisms directed against them, the plaintiff in error was clearly proved guilty beyond a reasonable doubt. A different verdict could not reasonably be expected on another trial and none of the errors were of such importance as would justify a reversal of the judgment, and it is therefore affirmed.

*Judgment affirmed.*